UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------x

TELEBEAM TELECOMMUNICATIONS
CORPORATION,

                         Plaintiff,

        - v. –

THE CITY OF NEW YORK, NEW YORK CITY
DEPARTMENT OF INFORMATION
TECHNOLOGY AND TELECOMMUNICATIONS,
and CITYBRIDGE, LLC,

                         Defendants.

------------------------------------------------------------------x

**OPINION AND ORDER**

14-cv-7100 (NG)

**GERSHON, United States District Judge:**

Plaintiff Telebeam Telecommunications Corporation ("Telebeam"), an operator of public payphones, asserts claims under the Federal Telecommunications Act of 1996 ("TCA"), 47 U.S.C. §§ 151 *et seq.*, against defendants City of New York ("City"), New York City Department of Information Technology and Telecommunications ("DoITT"), and CityBridge, LLC ("CityBridge"). Alleging that defendants have entered into an "exclusive" franchise agreement for the operation of payphones situated on New York City sidewalks in violation of TCA § 253(a), Telebeam seeks an injunction that annuls the franchise and permits Telebeam to retain its payphone infrastructure and provide competing service.

The parties have filed cross-motions for summary judgment on all claims asserted in Telebeam's First Amended Complaint ("FAC"). For reasons that follow, Telebeam's motion for summary judgment is denied and defendants' motions are granted.

## UNDISPUTED FACTS

Over the last half century, the City has addressed public payphones under a series of distinct regulatory schemes. This lawsuit concerns the latest evolution in the City's regulatory approach, best understood in historical context.

### *Local Law 78*

In 1959 the City enacted Local Law 78, which made it unlawful to install a payphone on any City sidewalk without a license. *See* N.Y.C. Admin Code § 19-128 (repealed 1996). At that time, the payphones located on the City's streets were all owned by New York Telephone ("NYT"), then an AT&T subsidiary. The City granted NYT, and later its successors, a license to continue operating those payphones, but no other entity was granted a license under Local Law 78.

Following the breakup of AT&T in 1982, companies unaffiliated with NYT, including Telebeam, began to install payphones both on buildings abutting the City's sidewalks (so-called "building line" installations) and on the sidewalks themselves. While the City contends that at least the sidewalk payphones violated Local Law 78, because they were installed without a license, they were not removed or otherwise regulated by the City. Payphones proliferated. Between 1985 and 1995, over 25,000 payphones were installed in the City—either on the building line or sidewalk—by entities other than NYT.

### *Local Law 68*

In an effort to improve service and enhance the aesthetics of payphone installations, in 1995 the City passed Local Law 68. *See* N.Y.C. Admin. Code §§ 23-401 *et seq*. The enactment repealed the licensing regime established under Local Law 78 and adopted a franchising process applicable to all payphones located on "the street or other inalienable property of the city." *Id.* at § 23-402. The City Charter defines "inalienable property" to include the City's "streets,

2

avenues, [and] highways." N.Y.C. Charter § 383. There is no dispute that the City's sidewalks are inalienable property of the City.

Under the Local Law 68 framework, a permit is required to operate a payphone on the City's sidewalks, *see* N.Y.C. Admin. Code § 23-402, and a franchise is required to obtain a permit, *see id.* § 23-403(a). Pursuant to the City's Charter, a franchise may "be awarded only in accordance with the provisions of an authorizing resolution adopted by the [New York City Council]." N.Y.C. Charter § 363(a). Franchises under Local Law 68 have been issued under a series of authorizing resolutions, the last two being Authorizing Resolution Nos. 2309 and 191.

In 1999, Telebeam, and more than 100 other payphone operators, obtained franchises under Local Law 68. The franchises were issued for a term of eleven years, which the City could extend to fifteen years at its sole discretion. After obtaining its franchise, Telebeam, which operated approximately 1,600 public payphones before becoming a franchisee, installed an additional 1000 permitted payphones on the City's sidewalks at a cost exceeding $25 million. The City exercised its option to extend the Telebeam franchise in 2010, setting a franchise termination date of October 14, 2014.

Over the life of its franchise, Telebeam generated approximately $171 million in revenues, mostly from the sale of advertising space. Indeed, payphone usage plummeted over the franchise period, with the City's non-advertising payphone revenues falling 98%, and the number of franchisees dwindling from 115 to nine.

### *The 2014 RFP*

In the years immediately preceding the expiration of Telebeam's franchise, the City began to evaluate ways to modernize the telecommunications services being provided on the City's streets. To engage urban designers and other experts in this effort, the City conducted a

"Reinvent Payphones" design challenge, which elicited more than 125 submissions. The City also issued a Request for Information regarding the possibilities of advanced public telecommunications.

Out of this process, the City published on April 30, 2014 a Request for Proposals ("RFP") for a new franchise to develop sidewalk telecommunications structures that would provide both telephone service and free internet connectivity via wireless fidelity ("Wi-Fi"). The RFP specified that the Wi-Fi "hotspots" provided by these structures would need to be integrated in a single network, enabling a user to remain connected to the internet as he or she moved through the system's footprint across the City's five boroughs. In a statement released after the RFP, DoITT's assistant commissioner Stanley Shor made clear that "the city is currently expecting to award one franchisee contract [under] the RFP." FAC Ex. F at 12.

The City received 10 proposals for the new franchise by the July 21, 2014 submission deadline, including one from Telebeam and another from CityBridge. Telebeam's submission was made on the assumption that multiple franchises would be granted and asserted that issuance of only a single franchise would violate the TCA. In this regard, Telebeam's submission echoed a letter that CityBridge's managing member, Titan Outdoor Communications, Inc. ("Titan"), had sent to the City in advance of the RFP. Titan's letter stated that issuance of an "exclusive franchise" under the RFP "would prohibit or have the effect of prohibiting all other [payphone] operators from providing telecommunications service, in direct violation of Section 253" of the TCA. *See* FAC, Ex. D.

### *The CityBridge Franchise*

On November 14, 2014, the City awarded the new franchise to defendant CityBridge to develop and operate what will be known as the LinkNYC Network ("LinkNYC") on the City's

4

sidewalks. Pursuant to CityBridge's franchise agreement, CityBridge will implement LinkNYC by installing 7,500 "Link Kiosks" on the City's inalienable property across the five boroughs. The Link Kiosks will provide Wi-Fi internet access within a 150-foot radius at up to "gigabit speeds"—that is, internet service 100 times faster than average municipal Wi-Fi and more than 20 times faster than average home internet service in the City. The system will be designed so that users travelling through the City will automatically connect to internet "hotspots" as they are encountered. The Link Kiosks also will provide free telephone calls to anywhere in the United States, wayfinding capabilities, touchscreen interfaces to access City services, and free cellular phone charging. The installation and operation of the kiosks will be funded by advertising revenues at no cost to taxpayers and generate franchising fees for the City anticipated to exceed $500 million over the next twelve years.

CityBridge's franchise agreement specifies, in a section titled "Non-exclusivity," that "[t]he City retains the absolute right to grant to any other Person a [payphone] franchise." Horowitz Decl., Ex. D7 at § 3.5. In the event the City grants an additional franchise before CityBridge has installed 4,000 Link Kiosks (with advertising), CityBridge will be entitled to an "equitable reduction" in its annual franchising fees. *See id.* Nevertheless, the authorizing resolutions under which CityBridge obtained its franchise—Authorizing Resolution Nos. 2309 & 191—have expired and successor resolutions have not been adopted. The City could renew the resolutions, but it does not profess an interest in doing so. To the contrary, the City's position is that issuing franchises to multiple operators would be disadvantageous because, as is undisputed, multiple operators would be disinclined to exchange information, including user databases and encryption protocols, needed for the system to operate in an integrated fashion. As the City puts it, "[h]aving one company accountable for the city-wide deployment and monitoring of service

ensures consistent, interoperable, and seamless Wi-Fi service." Declaration of Stanley Shor, dated Nov. 23, 2015, at ¶ 42.

*Transfer of Telebeam's Payphones and Infrastructure*

On October 7, 2014, when the City was still evaluating RFP submissions, it informed Telebeam and the other remaining franchisees that, although their franchises would expire October 14, 2014, they would be authorized to continue operations on a "holdover" basis. On December 30, 2014, after the CityBridge franchise agreement had been approved, the City encouraged Telebeam and the other holdover franchisees by letter "to use [their] best efforts to achieve a smooth transition to the CityBridge franchise with respect to [their] existing sidewalk facilities." FAC, Ex. P at 1. The CityBridge franchise agreement contemplates that, during the transition period, CityBridge will operate the holdover franchisees' payphones until they can be replaced with Link Kiosks. *See* Horowitz Decl., Ex. D.7 at §§ 3.2.2, 4.1.1.

In directing Telebeam to transfer its equipment to CityBridge, the City drew upon termination provisions in Telebeam's franchise agreement, pursuant to which the City can require Telebeam to sell its payphones to a City designee. *See id.*, Ex. D.3 at § 12.4.3. Other termination provisions in the agreement oblige Telebeam to remove its underground infrastructure and, if the infrastructure is not "readily movable," it reverts to the City at no cost. *See id.* at § 12.4.2.

As of summary judgment briefing, all holdover franchisees except Telebeam had sold their equipment to CityBridge. Telebeam continues to operate approximately 1300 payphones on the City's sidewalks.

## TELEBEAM'S CLAIMS

Telebeam's FAC asserts seven TCA counts, which, as Telebeam now acknowledges, substantially overlap. In its summary judgment papers, Telebeam reduces the seven counts to two distinct claims:

*First*, Telebeam challenges aspects of the City's franchising scheme—particularly Chapter 14 of the City Charter, Authorizing Resolutions Nos. 2309 & 191, and the 2014 RFP— as they have been applied to issue a single franchise to CityBridge. By abandoning its competition-based approach to public payphones, Telebeam contends, the City has prevented Telebeam from providing telecommunications services in violation of § 253(a) of the TCA.

*Second*, Telebeam asserts that termination provisions in its franchise agreement, forcing it to relinquish its payphone infrastructure, erect a barrier to market entry that separately violates § 253(a) of the TCA.[1]

On these bases, Telebeam seeks declaratory and injunctive relief annulling the CityBridge franchise and authorizing Telebeam to continue operating its payphones notwithstanding the expiration of its own franchise. Notably, Telebeam does not contend that the City's entire payphone franchising regime should be struck down, or even that CityBridge should be prevented from operating the payphones it currently controls. Rather, the injunction Telebeam seeks would prevent the City from taking action to displace Telebeam until new authorizing resolutions are adopted and franchises compliant with the TCA are issued.

---

[1]     The FAC's third count appears to assert a third, distinct claim—namely, that particular provisions of the City Charter and Authorizing resolutions Nos. 2309 and 191 violate § 253(a) by imposing excessively burdensome franchising requirements. This claim is nowhere addressed in Telebeam's summary judgment submissions and is treated as abandoned. *See Jackson v. Fed. Exp.*, 766 F.3d 189, 198 (2d Cir.2014) (noting that, when a counseled litigant opposes a motion for summary judgment, it is appropriate to infer that "claims or defenses that are not defended have been abandoned").

Agreeing that Telebeam's claims do not turn on any material facts in dispute, the parties have cross-moved, prior to discovery, for summary judgment on all claims asserted in the FAC.

## DISCUSSION

### A. The TCA

The TCA provisions at issue are best understood against the circumstances that prompted their enactment. Before the TCA, "[s]tates typically granted an exclusive franchise in each local service area to a local exchange carrier." *AT & T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 371 (1999). A local exchange carrier operates as "a transportation network for communications signals, radiating like a root system from a central office (or several offices for larger areas) to individual telephones, faxes, and the like." *Verizon Commc'n, Inc. v. F.C.C.*, 535 U.S. 467, 490 (2002) (internal quotation marks omitted). A local exchange network is composed of several components: "the local loops (wires connecting telephones to switches), the switches (equipment directing calls to their destinations), and the transport trunks (wires carrying calls between switches)." *AT & T Corp.*, 525 U.S. at 371.

The TCA was designed to "bring competition to local-exchange markets." *Verizon Commc'n, Inc,* 535 U.S. at 539. But this could not be accomplished with the flip of a switch. The incumbent local exchanges enjoyed "an almost insurmountable competitive advantage" because newcomers could compete only by "replicating the incumbent's entire existing network." *Id.* at 490. To level the playing field, the TCA imposes a number of duties on incumbent local exchange carriers "intended to facilitate market entry," including a requirement that incumbents share their network with would-be competitors. *See AT & T Corp.* 525 U.S. at 371. In addition, the TCA prevents state and local governments from "enforce[ing] laws that impede competition." *Id.* This latter objective is served by § 253(a), the provision Telebeam

invokes here. Falling under a section of the statute titled "Removal of barriers to entry," § 253(a) provides:

> No State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service.

47 U.S.C. § 253(a).

A prohibition on telecommunication services "does not need to be complete or insurmountable to run afoul of § 253(a)." *TCG New York, Inc. v. City of White Plains*, 305 F.3d 67, 76 (2d Cir. 2002) (internal quotation marks omitted). But that does not mean that any restriction, no matter how trivial, violates the statute. Section 253(a) is violated only by restrictions that "materially inhibit[] or limit[] the ability of any competitor or potential competitor to compete in a fair and balanced legal and regulatory environment." *Id.* (internal quotation marks omitted).

If a regulation is found to violate § 253(a), that also does not end the inquiry. Section 253 "provides for a number of 'safe harbor' exceptions for states and local governments to establish regulatory requirements." *Global Network Commc'ns, Inc. v. City of New York*, 562 F.3d 145, 151 (2d Cir. 2009) ("*Global Network*"). Defendants here rely on the safe harbor set forth at § 253(c), which provides:

> *Nothing in this section affects the authority of a State or local government to manage the public rights-of-way* or to require fair and reasonable compensation from telecommunications providers, on a competitively neutral and nondiscriminatory basis, for use of public rights-of-way on a nondiscriminatory basis, if the compensation required is publicly disclosed by such government.

47 U.S.C. § 253(c) (emphasis added). A regulation that falls within this safe harbor is protected even if it has the effect of prohibiting telecommunications service in contravention of § 253(a). *See Global Network*, 562 F.3d at 150-51.

Although § 253 was designed to generate competition in local exchange markets, payphones also provide "telecommunications service" as that term is defined by the TCA and used in § 253. *See* 47 U.S.C. § 153(53). Regulations governing payphones are thus subject to both § 253(a) preclusion and the § 253(c) safe harbor. *See Global Network*, 562 F.3d at 150-51.[2]

## B. Telebeam Has Standing

CityBridge contends that Telebeam lacks both Article III and prudential standing. I disagree.

The requirements for Article III standing are well-known: "The plaintiff must have suffered or be imminently threatened with a concrete and particularized 'injury in fact' that is fairly traceable to the challenged action of the defendant and likely to be redressed by a favorable judicial decision." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1386 (2014). CityBridge focuses exclusively on the redressability component, contending that, because Telebeam's franchise has expired, the elimination of the CityBridge franchise could not remedy Telebeam's asserted injuries—that is, enable Telebeam to provide authorized payphone services on the City's sidewalks or prevent the City from disposing of Telebeam's infrastructure in accordance with provisions specified in Telebeam's franchise agreement.

The argument proceeds by mischaracterizing the relief Telebeam is pursuing. *See E.M. v. New York City Dep't. of Educ.*, 758 F.3d 442, 450 (2d Cir. 2014) (redressability requirement

---

[2]    It bears note that Congress also addressed payphones directly in a different section of the TCA. *See* 47 U.S.C. § 276. There were historical reasons for the separate treatment. Technological developments in the 1980s had permitted "independent [payphone providers] to begin competing against the payphone operations of the [local exchange carriers]." *Ill. Pub. Telecomm. Ass'n v. F.C.C.*, 117 F.3d 555, 558 (D.C. Cir. 1997). Section 276 was designed to "promote a more evenhanded competitive environment." S. Rep. 104-23, at 58 (1995). It does so in a number of respects, including by forbidding incumbent local exchange carriers from subsidizing their payphones with revenues derived from other aspects of their operations. *See* 47 U.S.C. § 276(a).

turns on whether "relief requested" is likely to redress injuries asserted (internal quotation marks omitted)). Telebeam is seeking an injunction that would not only void the CityBridge franchise, but also would authorize Telebeam to retain its equipment and continue its payphone operations without a franchise (at least until new franchise authorizing resolutions are adopted). CityBridge does not question this court's capacity to grant such relief were Telebeam to prevail. The redressability requirement is thus satisfied.

CityBridge's prudential standing arguments fare no better. Prudential standing doctrine prevents a litigant from "raising another person's legal rights" and bars "adjudication of generalized grievances more appropriately addressed in the representative branches." *Lexmark*, 134 S. Ct. at 1386 (internal quotation marks omitted). Here, CityBridge contends that Telebeam lacks prudential standing because, in challenging the CityBridge franchise, Telebeam asserts CityBridge's rights, not its own. But on the contrary, Telebeam's position is that the CityBridge franchise is unlawful and should be set aside. That contention in no way invokes CityBridge's rights. It is premised on rights Telebeam asserts under the TCA, for itself, to provide telecommunications service.

CityBridge also asserts that Telebeam's claims fall without the "zone of interests" protected by the TCA. As the Supreme Court recently clarified, though commonly framed as a requirement of prudential standing, the zone of interest inquiry is not a standing concern at all. *See id.* at 1387. Rather, the analysis simply "requires us to determine, using traditional tools of statutory interpretation, whether a legislatively conferred cause of action encompasses a particular plaintiff's claim." *Id.*

CityBridge contends that the TCA does not encompass Telebeam's claims principally because Telebeam no longer has a franchise.[3]  But the expiration of Telebeam's franchise is not all that has occurred here.  The undisputed facts show that the City has transitioned away from the multi-franchisee system that grew from Local Law 68, issuing a single franchise to CityBridge to provide all payphone service on the City's streets.  In doing so, the City denied Telebeam's application to provide its own payphone services, and allowed to expire the authorizing resolutions needed to grant additional franchises.  Telebeam is entitled to challenge this palpable shift in the City's regulatory approach.

The suggestion that only entities with a franchise can assert TCA claims also gets the zone of interests analysis backwards.  The TCA provision Telebeam invokes preempts regulations that "*prohibit*[] the ability of any entity to provide . . . telecommunications service." *See* 47 U.S.C. § 253(a) (emphasis added).  If anyone can sue under this proscription, it is an entity, such as Telebeam, alleging that franchising or other regulations prevent it from entering (or remaining in) the market.

The district court opinion in *Global Network Communications, Inc. v. City of New York*, 2008 WL 215892 (S.D.N.Y. Jan. 22, 2008), cited by CityBridge, is not to the contrary.  The issue there was whether a plaintiff who had been *"properly denied"* a payphone franchise was entitled to sell his telecommunications equipment to the buyer of his choice.  *See id.* at *5 (emphasis added).  The court held that, because the plaintiff had no right "to legally occupy City sidewalks," his claims concerning the disposition of his property fell outside the TCA's zone of

---

[3]    The Second Circuit has not addressed whether § 253(a), which on its face places limits only on state and local governments, creates a right of action against private, non-governmental entities. CityBridge nevertheless accepts that it can be sued under § 253(a) of the TCA. I do not consider whether that concession was necessary.

interest. *See id.* Here, by contrast, Telebeam's right to occupy the City's sidewalks is the core issue to be decided. Telebeam also is alleging, unlike the plaintiff in *Global Network*, that the equipment removal provisions in its franchise agreement erect barriers to entry that separately violate the TCA. Telebeam can pursue this claim even if it has been lawfully ousted from the City's streets.[4]

CityBridge also asserts that Telebeam is pursuing TCA claims not to provide telecommunications service but to sell advertising space—a business objective with no bearing on the interests protected by the TCA. This may be so, but nothing in the TCA indicates that § 253(a) preclusion should turn on the business calculus prompting an entity to provide telecommunications service; Telebeam's motivations, in other words, are irrelevant to the right of action § 253(a) creates.[5] Subject to the safe harbor provisions, § 253(a) protects all telecommunications service providers "from those state or local rules, laws, regulations or requirements that have the effect of prohibiting them from providing such services—period."

---

[4] The remaining cases cited by CityBridge are equally distinguishable. The court in *Underground Construction Co. v. City and County of San Francisco*, 2002 WL 1585628 (N.D. Cal. July 15, 2002), concluded that a construction company that installed conduit for telecommunications providers did not provide "telecommunications services" and thus fell outside the TCA's zone of interests. *See id.* at *2. But "unlike a company that merely creates the tunnels through which telecommunications wiring is snaked, [payphone operators] clearly provide actual telecommunications service by installing and maintaining public pay telephones themselves." *Coastal Commc'ns Serv., Inc. v. City of New York*, 658 F. Supp. 2d 425, 442 (E.D.N.Y. 2009) (distinguishing *Underground Construction*). Similarly unhelpful is the Second Circuit's standing discussion in *Global Network*, 562 F.3d 145. The Circuit held only that a payphone provider without a franchise lacks standing to challenge advertising and other restrictions that "affect only entities operating under a license." *Id.* at 152. CityBridge does not explain how the prohibitions Telebeam challenges here might fall within that category.

[5] Nonetheless, it is notable that Telebeam's principal revenues, like those revenues CityBridge is anticipating, are based on the sale of advertising space and not on the sale of a telecommunications service. Under these circumstances, the role of competition in enhancing the provision of telecommunications services, as Congress envisioned in the TCA, is subject to question.

13

*Coastal*, 658 F. Supp. at 443 (rejecting contention that payphone operator was not a "telecommunications" provider because its business was not economically sustainable without advertising revenues).

Although Telebeam has standing, it cannot sue defendant DoITT. The City Charter provides that "[a]ll actions and proceedings for the recovery of penalties for the violation of any law shall be brought in the name of the city of New York and not in that of any agency, except where otherwise provided by law." N.Y.C. Charter § 396. This provision "has been construed to mean that New York City departments, as distinct from the City itself, lack the capacity to be sued." *Ximines v. George Wingate High Sch.*, 516 F.3d 156, 160 (2d Cir. 2008). Because it is "an agency of the City of New York, DoITT is not a suable entity." *New Phone Co. v. New York City Dep't of Info. Tech. & Telecomm.*, 2006 WL 6908254, at *7 (E.D.N.Y. Aug. 25, 2006).

### C.   The § 253(c) Safe Harbor Applies

The parties dispute whether Telebeam has actually been prohibited from providing telecommunication services within the meaning of TCA § 253(a). But because I conclude that defendants are protected by the § 253(c) safe harbor, as to all claims Telebeam asserts, I need not pass on any of the issues the parties raise under § 253(a). *See Global Network*, 562 F.3d at 151 (applying safe harbor without first addressing whether denial of franchise violated § 253(a)); *Sw. Bell Tel., LP v. City of Houston*, 529 F.3d 257, 263 (5th Cir. 2008) ("To say the least, requiring a [TCA] § 253(a) analysis, notwithstanding an ordinance's meeting the safe-harbor provision, would be an exercise in futility.").

Again, § 253(c) provides:

> Nothing in this section affects the authority of a State or local government to manage the public rights-of-way or to require fair and reasonable compensation from telecommunications providers, on a competitively neutral and nondiscriminatory basis, for use of public rights-of-way on a nondiscriminatory basis, if the compensation required is publicly disclosed by such government.

47 U.S.C. § 253(c).

Although § 253(c) contains some rather enigmatic phrasing,[6] I do not approach it without guidance. To begin with, no one would dispute that the police power historically exercised by municipalities has encompassed the authority to make selective determinations as to the services a municipality wishes to provide on its own property for its own citizens. This is significant because, in construing the scope of § 253, we must "start with the assumption that the historic police powers of the States were not to be superseded by [a] Federal Act unless that was the clear and manifest purpose of Congress." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (internal quotation marks omitted). By expressly excluding "rights-of-way" management from the preemptive scope of § 253(a), the § 253(c) safe harbor indicates an intent to preserve, rather than displace, local governments' historic ability to regulate the use of public property.

The Second Circuit recognized as much in a series of three decisions addressing the safe harbor's contours. The most recent decision, *New Phone Co. v. DoITT*, 355 F. App'x 503 (2d Cir. 2009), is particularly instructive because it involved a challenge to the City's payphone franchising framework established under Local Law 68. The *New Phone* court concluded that

---

[6]     *See Qwest Corp. v. City of Santa Fe*, 380 F.3d 1258, 1272 (10th Cir. 2004) (noting the "confusing linguistic construction of § 253(c)"); *New Jersey Payphone Ass'n, Inc. v. Town of W. New York*, 299 F.3d 235, 240 (3d Cir. 2002) (observing that "[s]ection 253 is quite inartfully drafted and has created a fair amount of confusion"); *see generally AT&T Corp.*, 525 U.S. at 397 ("It would be gross understatement to say that the [TCA] is not a model of clarity. It is in many important respects a model of ambiguity or indeed even self-contradiction.").

the framework was protected by § 253(c) because it governed only "the installation and management of [payphones] on public property" and did not extend to payphones "on private property." *Id.* at 505. The court held that, "[b]y its plain terms, Section 253(c) insulates *any such scheme* from the TCA's preclusive effect." *Id.* (emphasis added).[7]

In so holding, *New Phone* did not break new ground. It simply applied the logic of *Global Network*, 562 F.3d 145, a case decided just eight months prior by a panel with one overlapping member (the Honorable Rosemary S. Pooler). In *Global Network*, the Second Circuit held that the § 253(c) safe harbor applied to the City's denial of a payphone franchise to a person with connections to organized crime. The denial was predicated on authority the City asserted under Local Law 68 to control the rights of way. In finding the safe harbor applicable, the Court of Appeals emphasized that "Local Law 68 applies only to City Property," and distinguished regulations invalidated in a prior decision, *TCG New York*, 305 F.3d 67, upon which Telebeam now heavily relies. *See Global Network*, 562 F.3d at 148, 152.

The plaintiff in *TCG New York* was not a payphone provider seeking to provide services originating from the rights of way. Rather, it was a telecommunications company seeking to lay conduit through the rights of way to compete with the incumbent local exchange carrier in serving the larger community. The municipality involved, the City of White Plains, required the plaintiff to abide by a franchising scheme it did not impose on the incumbent. In striking down various aspects of that scheme, the Second Circuit emphasized that requirements concerning the placement of the plaintiff's equipment "might be permissible if [they] were limited to public

---

[7] *New Phone* was one of two cases brought by the same plaintiff challenging Local Law 68. After the district court dismissed the complaints in both cases, the Second Circuit heard the resulting appeals in tandem. The Second Circuit's summary order in the companion appeal upheld Local Law 68 on the same grounds, observing that the scheme "was exempt from the terms of the TCA." *New Phone Co. v. City of New York*, 355 F. App'x 501, 502 (2d Cir. 2009).

land." *TCG New York*, 305 F.3d at 81. But, given the nature of the network the plaintiff was attempting to build, the White Plains regulations necessarily had the effect of restricting its "ability to develop a network even on private property." *Id.* As *Global Network* recognized, this holding provides "no comfort" to entities seeking to install payphones on the rights of way. *See Global Network*, 562 F.3d at 152. The regulation of that activity, unlike restrictions imposed on networks extending onto private property, is protected because it is "based only on the City's rights under § 253(c) to regulate public rights-of-way." *Id.*

The principle to be drawn from the Second Circuit's decisions is thus plain enough: regulations governing telecommunications services on public rights of way are protected by § 253(c) so long as they do not also apply to private property, either directly or by impeding the development of broader networks that need to pass through the rights of way to compete.

Here, the entire regulatory framework under which the City has acted—both in granting a single franchise to CityBridge and in dispossessing Telebeam of its payphones—applies only to the rights of way. *See* N.Y.C. Admin. Code § 23-402. Thus, all of the payphones at issue, including those CityBridge is authorized to install under its franchise and those Telebeam must relinquish, are situated on the rights of way. None of the restrictions Telebeam challenges limit its ability to install payphones on private property or on municipal property that is not inalienable. *See* Horowitz Decl., Ex. D3, at § 2.5.1.

Also not at issue are any restrictions on the building of networks through the rights of way to serve the broader community. This fact distinguishes *TCG New York* and the FCC decisions on which Telebeam principally relies, all of which involved local exchange carriers or other telecommunication service providers seeking access to the rights of way to serve larger

17

territories.[8]  Telebeam, by contrast, seeks only to provide payphone services originating from the

City's streets.  As the Second Circuit has held, repeatedly, the City's regulation of that endeavor

falls squarely within the safe harbor § 253(c) affords.  *See New Phone*, 355 F. App'x at 505;

*Global Network*, 562 F.3d at 152.

Telebeam attempts to distinguish *New Phone* and *Global Network* on the ground that

both cases involved facial challenges to the franchising scheme established under Local Law 68,

whereas Telebeam challenges the scheme only to the extent it has been applied to issue a single

franchise.  Whether or not Telebeam has aptly characterized the claims asserted in *New Phone*

and *Global Network*, the distinction it draws is one without a difference.  If the Local Law 68

franchising scheme is protected by § 253(c), because it applies only to payphones positioned on

the rights of way, so too are specific applications of the scheme.  It also makes no difference that

payphones on the rights of way can carry calls onto private property.  If this capability ejected

payphones from the safe harbor, as Telebeam suggests, *New Phone* and *Global Network* would

have been decided differently.  There also would be little left of the safe harbor, for any

meaningful telecommunications service offered on public property will carry calls to private

property.[9]

Unable to distinguish *New Phone* and *Global Network*, Telebeam contends that the

TCA's legislative history demonstrates that Congress intended § 253(c) to insulate only

---

[8]      *See TCG New York*, 305 F.3d 67; *In the Matter of Classic Tel., Inc.*, 11 F.C.C. Rcd. 13082
(1996); *In the Matter of the Petition of the State of Minn. for A Declaratory Ruling Regarding
the Effect of Section 253 on an Agreement to Install Fiber Optic Wholesale Transp. Capacity in
State Freeway Rights-of-Way*, 14 F.C.C. Rcd. 21697 (1999).

[9]      In the same vein, the Wi-Fi service provided by the LinkNYC system—which will emanate
150 feet from each Link Kiosk—may at points extend onto private property.  But just as the
connectivity of payphones to points off the rights of way does not prevent application of
§ 253(c), nor can any incidental spillover service the LinkNYC system might provide.

regulations that govern the time, place and manner of rights-of-way construction. Telebeam distorts the TCA's legislative history. It is true, as Telebeam observes, that an early version of § 253(c) circulated in the House delineated a narrow safe harbor that would have protected only local construction permitting regimes. *See* H.R. 1555, 104th Cong. § 243(c) (as reported by H.R. Comm. on Commerce, July 24, 1995). But this version did not make it out of floor debates. Concerned that the bill did not adequately "protect the authority of local governments to control public rights-of-way," Congressmen Stupak and Barton proposed an amendment with language virtually identical to what would become § 253(c). *See* 141 Cong. Rec. H8460 (daily ed. Aug. 4, 1995).[10] That amendment passed by a vote of 338 to 86. *See id.* at H8477. "Few principles of statutory construction are more compelling than the proposition that Congress does not intend *sub silentio* to enact statutory language that it has earlier discarded in favor of other language." *I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421, 442-43 (1987) (internal quotation marks omitted).

Telebeam also relies on a letter from the San Francisco City Attorney that was incorporated into the TCA's congressional record during the Senate's floor debates. Although the letter discussed basic "rights of way" management regulations—primarily municipal restrictions on the time, place, and manner of construction projects—it did not address, much less purport to exhaust, the intended scope of § 253(c). *See* 141 Cong. Rec. S8172 (Daily ed. June 12, 1995).[11] I recognize that the FCC has described the San Francisco City Attorney's letter

---

[10]    Invoking the distinction that animates the Second Circuit's interpretation of § 253(c), Congressman Barton explained that, while the amendment would "not let the city governments prohibit entry of telecommunications service providers for pass through or for providing service to their community," it would otherwise guarantee that local governments can "control access within their city limits." *See id.*; *see also Disabled in Action v. Hammons*, 202 F.3d 110, 124 (2d Cir. 2000) (statement of legislation's sponsor among "the most authoritative and reliable materials of legislative history").

[11]    The San Francisco City Attorney's letter specifically recommended that TCA § 253(d)— which authorizes the FCC to preempt regulations violating § 253—be eliminated from the TCA

as exemplifying "the types of restrictions that Congress intended to permit under section 253(c)." *In the Matter of Classic Tel., Inc.*, 11 F.C.C. Rcd. 13082, 13103 (1996). But the interpretation of the legislative record and of Congress's intent relied upon by the FCC, and here by Telebeam, is not persuasive. Most importantly, the Second Circuit rejected the FCC's narrow reading of the safe harbor in *Global Network* and *New Phone*, upholding prohibitions on telecommunications service wholly unrelated to the limited rights of way management functions described by the San Francisco City Attorney. *See Global Network*, 562 F.3d at 151; *New Phone*, 355 F. App'x at 505. The purpose of the safe harbor, the Circuit has found, was not simply to save construction permitting regulations, but to preserve local governments' authority "to regulate telecommunications services which involve the use of public property." *New Phone*, 355 F. App'x at 505.[12]

Continuing to fight controlling case law, Telebeam contends that the safe harbor applies only to regulations shown to be "competitively neutral and nondiscriminatory" as that phrase is used in § 253(c). I do not agree. The "competitively neutral and nondiscriminatory" clause appearing in the middle of § 253(c) is naturally read to modify only the immediately preceding phrase "to require fair and reasonable compensation." *Cablevision of Boston, Inc. v. Pub.*

entirely. FCC preemption would be problematic, according to the San Francisco City Attorney, because it would implicate the FCC in routine aspects of rights-of-way management. *See* 141 Cong. Rec. S8172 (daily ed. June 12, 1995). Ultimately, Congress retained § 253(d), but removed § 253(c) from its scope in an effort to retain "the right of local communities to deal with their rights of way." 141 Cong. Rec. S8308 (daily ed. June 14, 1995) (statement of Sen. Gorton, sponsor of amendment).

[12]    For this reason, Telebeam's heavy reliance on *Coastal*, 658 F. Supp. 2d 425, is misplaced. In *Coastal*, the court followed the FCC's interpretation of the safe harbor. *See id.* at 447. But *Coastal* did not address *Global Network*, which was decided after the *Coastal* litigants had submitted their summary judgment papers. Nor did the court have the benefit of *New Phone*, decided months later, in which the Second Circuit applied *Global Network's* teachings. The City moved the court to reconsider its summary judgment decision on these bases, and that motion remained pending and unresolved when the case settled.

*Improvement Comm. of City of Boston*, 184 F.3d 88, 100-01 (1st Cir. 1999).[13] The Second Circuit adopted this natural reading of § 253(c) in *TCG New York* by applying a competitive neutrality requirement only to fee provisions of the ordinance there challenged, while noting that, with respect to "non-fee" provisions, the standard was different: "[h]ere, the question is whether the regulations are designed to 'manage the public rights-of-way,' as permitted by § 253(c), or impermissibly go further." 305 F.3d at 79-81.[14] In short, only fees imposed on the use of the rights of way must be "competitively neutral and nondiscriminatory" to fall within the safe harbor. This limitation does not apply to non-fee regulations, such as those at issue here.

This is not to suggest that local governments have carte blanche to impose whatever non-fee restrictions they see fit. First, only bona fide "rights of way" regulations are insulated from TCA preemption. As discussed above, regulations that extend onto private property, or that restrict the development of a telecommunications network on private property, do not qualify as an effort to manage the rights of way. Second, the safe harbor saves regulations from TCA preemption only. It offers no protection against other applicable local, state, and federal checks on discriminatory and anticompetitive state action.

---

[13] As *Cablevision* observed, several courts and some (but not all) FCC decisions have presumed, often with little analysis, that the "competitively neutral and nondiscriminatory" restriction applies to all regulations, even those unrelated to the imposition of fees. *See id.* at 102; *see also New Jersey Payphone*, 299 F.3d at 245-46; *Qwest Corp.*, 380 F.3d at 1272. *Cablevision* questioned whether this "linguistically implausible" interpretation of the safe harbor might better serve congressional intent, but ultimately took no position on the matter and resolved the appeal on other grounds. *See* 184 F.3d at 101-02.

[14] In *Global Network*, in response to Global's argument that denying it a franchise was discriminatory, since other successful applicants for franchises had criminal histories, the Circuit noted that the City acted properly because the conduct associated with Global was more grave. But the heart of the decision was that the regulation of public payphones is "based only on the City's right under § 253(c) to regulate public rights-of-way." *Global Network*, 562 F.3d at 152.

In sum, while Telebeam has standing to assert claims under the TCA, the scheme it challenges is insulated by the § 253(c) safe harbor. Accordingly, even if Telebeam has been prevented from providing telecommunications service within the meaning of § 253(a), an issue I do not reach, its claims fail as a matter of law.

## CONCLUSION

For the foregoing reasons, the motions for summary judgment filed by defendants are granted, and Telebeam's motion for summary judgment is denied. The Clerk of Court is respectfully directed to enter judgment for defendants and to close the case.

**SO ORDERED.**

/s/ *Nina Gershon*

**NINA GERSHON**
**United States District Judge**

Dated: Brooklyn, New York
      July 11, 2016